## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

MARINA ESPÍRITU, *et al.*,

    *Plaintiffs*,

v.

COMISION ESTATAL DE
ELECCIONES, *et al.*,

    *Defendants*.

Civ. No. 24-cv-01446 (MAJ)

## OPINION AND ORDER

On September 22, 2024, Marina Espíritu, Iris Delia Torres-López, Víctor Altieri, and Alicia Vázquez-Figueroa (collectively "Plaintiffs") initiated this action pursuant to 42 U.S.C. § 1983 for alleged violations of their First and Fourteenth Amendment rights.[1] (**ECF No. 47**). Pending before the Court is Plaintiffs' Motion for Preliminary Injunction (the "Motion") to extend Puerto Rico's voter registration deadline from September 21, 2024, to October 6, 2024. (**ECF No. 10**). They also seek an update to public education materials, including written, online, and on-air materials, to reflect the above deadline extension; and the allocation of necessary budget and personnel to guarantee the right to vote of the people of Puerto Rico on the upcoming November 5 general election.[2] *Id.*

---

[1]    On the date of filing, the named Plaintiffs were Marina Espíritu, Iris Delia Torres-López, Dante Vélez-Iriarte, and Francisco Concepción-Márquez. (**ECF No. 1**). On September 26, 2024, at the eleventh-hour prior to the injunction hearing, Dante Vélez-Iriarte and Francisco Concepción-Márquez were substituted with Víctor Altieri and Alicia Vázquez-Figueroa. Plaintiffs' substitution will be further discussed below.

[2]    To the extent Plaintiffs request the Court to enter a declaratory judgment that the CEE's refusal to allow the extension of the registration deadline violates Article 5.11(2)(a)(b), the Court of First Instance of Puerto Rico, San Juan Superior Court already announced an authoritative interpretation of the Puerto Rico Electoral Code and found in the negative on this issue. Accordingly, this Court does not have jurisdiction to revise that interpretation. (**ECF No. 33-1**).

The named Defendants are the Comisión Estatal de Elecciones ("CEE"), the Hon. Jessika D. Padilla-Rivera, President of the CEE; the Commonwealth of Puerto Rico through the Hon. Domingo Emanuelli-Hernández, Attorney General of Puerto Rico; Aníbal Vega-Borges, Commissioner of the Partido Nuevo Progresista; Karla Angleró-González, Commissioner of the Partido Popular Democrático; Lillian Aponte-Dones, Commissioner of the Partido Movimiento Victoria Cuidadana; Roberto I. Aponte-Berríos, Commissioner of the Partido Independentista Puertorriqueño; and Juan Frontera-Suau, Commissioner of the Partido Proyecto Dignidad (collectively "Defendants"). (**ECF No. 47**). Defendants oppose Plaintiffs' request, arguing first that this Court lacks jurisdiction over the instant matter, and second, that the set deadline is essential to ensure the proper administration of the upcoming election and does not substantially burden any voters' rights. (**ECF Nos. 35, 48**). The Court agrees with both contentions, and Plaintiffs' Motion is thus **DENIED**.

## I.     PROCEDURAL BACKGROUND

Due to the urgency of the issues, the procedural background of this case is atypical. Plaintiffs filed their Complaint on September 22, 2024, one day after the September 21, 2024 voter registration deadline had elapsed, seeking a temporary restraining order, a declaratory judgment, and a preliminary and permanent injunction. (**ECF No. 1**). However, Plaintiffs did not file a Motion for Temporary Restraining Order or Preliminary Injunction, as required by Federal Rule of Civil Procedure 65. Accordingly, the Court issued an Order denying Plaintiffs' request for injunctive relief without prejudice and ordered them to file a formal motion under said rule by September 24, 2024, at 5:00pm, if that was indeed the relief they sought. (**ECF No. 7**). Anticipating the imminent filing of Plaintiffs' motion, the Court also ordered Plaintiffs to serve process upon Defendants,

and gave Defendants until September 26, 2024, at 12:00pm to respond to the incoming motion—among other things. *Id.*

On September 23, 2024, Plaintiffs filed the instant Motion, wherein they requested both a temporary restraining order and a preliminary injunction. (**ECF No. 10**). The Court denied Plaintiffs' request for a temporary restraining order and, due to the urgency of the matter, scheduled a preliminary injunction hearing for September 27, 2024. (**ECF No. 18**).

In compliance with the Court's order, Defendants filed their opposition to Plaintiffs' Motion on September 26, 2024. (**ECF No. 35**). Defendants not only questioned the Court's jurisdiction, but also alleged that Plaintiffs had failed to satisfy the grounds for injunctive relief. *Id.* Defendant's jurisdictional argument was supplemented by Defendant Aníbal Vega-Borges' opposition filed that same day. (**ECF Nos. 35, 48**).

On September 25, 2024, the Court also issued an Order notifying the parties that the preliminary injunction hearing would be consolidated with the trial on the merits in accordance with Federal Rule of Civil Procedure 65(a)(2). (**ECF No. 29**). Thereafter, on September 26, 2024, the day before the hearing, at roughly 9:00p.m., Plaintiffs filed an Amended Complaint substituting two of the previously named Plaintiffs.[3] (**ECF No. 47**).

At the start of the hearing, Plaintiffs announced that they would be presenting Mr. Héctor Luis Acevedo as an expert witness. (**Transcript 21:17-25**). No prior notice was given to Defendants. (**Transcript 21:23-25; 22:1-2**). Defendants then moved the Court to: (1) exclude the proposed expert witness for lack of notice; and (2) strike the Amended Complaint because the two newly named Plaintiffs did not properly brief their request for

---

[3]        Víctor Altieri and Alicia Vázquez-Figueroa replaced Dante Vélez-Iriarte and Francisco Concepción-Márquez as Plaintiffs in the instant matter. (**ECF Nos. 1, 47**).

a preliminary injunction for the purposes of the hearing. (**Transcript 15:6-9; 22:1-2**). Defendants also stated their opposition to consolidation of the hearing with the trial on the merits, arguing the jurisdictional issue was dispositive, and lack of adequate time to prepare in light of the filing of the Amended Complaint hours before the evidentiary hearing. (**Transcript 15:10-21**). The Court granted Defendants' request to exclude the expert witness,[4] held the motion to strike the Amended Complaint in abeyance, and asked the parties to begin with their arguments addressing the Court's jurisdiction. (**Transcript 22:1-7**). After hearing the parties' jurisdictional arguments, the Court recessed to allow Defendants time to review the Amended Complaint. During the recess, the Court issued an Order denying Defendants' request to strike the Amended Complaint, but granted their request to deconsolidate the hearing, indicating that trial would be scheduled at a later date. (**ECF No. 50**).

Once the hearing commenced, the Court heard testimony from Plaintiffs' witnesses: the CEE General Secretary Rolando Cuevas-Colón ("Cuevas") and Plaintiff Víctor Altieri ("Altieri"). The remaining three Plaintiffs left the hearing without leave of Court before testifying.[5] The parties also introduced the following documents into evidence: (1) a letter from Hon. Jessika D. Padilla-Rivera regarding electoral transactions

---

[4]     Under Federal Rule of Evidence 103, Plaintiffs made an offer of proof and proffered that Mr. Acevedo was an expert on electoral matters. However, they failed to submit Mr. Acevedo's curriculum vitae into evidence. Aside from a general argument as to Mr. Acevedo's qualifications, Plaintiffs failed to explain the intended scope of testimony, the basis of his opinion and how the expert's proposed opinion, would likely assist the trier of fact to understand or determine a fact issue. *See Marrero-Rolón v. Autoridad de Energía Eléctrica*, 15-cc-1167, 2018 WL 8805485, at *1 (D.P.R. Sept. 10, 2018) (quoting *Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co.*, 161 F.3d 77, 80 (1st Cir. 1998)). ("Courts must also assess the relevance of the expert testimony, 'not only in the sense that all evidence must be relevant, but also in the incremental sense that the expert's proposed opinion, if admitted, likely would assist the trier of fact to understand or determine a fact in issue.'").

[5]     Plaintiffs Marina Espíritu, Alicia Vázquez-Figueroa, and Iris Delia-Torres left the hearing without testifying or requesting leave of Court, putting into question their interest in this case. Thus, as per Defendants' request, their request for injunctive relief was dismissed in open Court.

through the Electronic Registration System ("eRE") (Plaintiffs' Exhibit 1); (2) an email sent to Altieri regarding his new enrollment request (Plaintiffs' Exhibit 2); (3) an email sent to Altieri regarding the rejection of his enrollment request (Plaintiffs' Exhibit 3); and (4) a list of permanent and temporary inscription facilities (from 2021-2024) (Defendants' Exhibit A).

## II.    FACTUAL BACKGROUND

Voting processes in Puerto Rico are governed by the Código Electoral de Puerto Rico ("Election Code"), which is passed by the Legislative Assembly and signed into law by the Governor. (**ECF No. 47 at 14 ¶ 62**). "The Election Code is a comprehensive set of rules that aims to facilitate voters' access to the polls, guarantee Puerto Ricans' right to vote[,] and modernize the voting process." *Id*. Pursuant to the Election Code—which was amended in 2020—elections in Puerto Rico are overseen and managed by the CEE. *Id*. at 8 ¶ 26; *Id*. at 14 ¶ 62.

Relevant to this action, Article 5.11(2) of the Election Code, states that:

Four-year Election Cycle of the 2024 General Election:

(a) As of this cycle, no registration, reactivation, transfer, or relocation of a voter for the 2024 General Election, or successive elections, shall be authorized within thirty (30) days before such election.
(b) The absolute right of a voter to vote in the precinct and electoral unit where he is registered is hereby guaranteed if he changes his domicile to another precinct or electoral unit within thirty (30) days before the voting event.

16 L.P.R.A. § 4571(2).

In April 2023, the CEE issued a Resolution advancing the closing date for voter registration from thirty days before the election, to forty-five. (**ECF No. 47 at 11 ¶¶ 48-49**). The deadline, which was advanced by 15 days, thus went from October 6, 2024, to September 21, 2024. *Id*. ¶ 47. The CEE argues that "in its expertise and with the benefit

of previous experiences, the September 21, 2024, deadline was set to properly give way to a series of events that can only commence once voter registration has concluded." (**ECF No. 35 at 15**). It maintains that "[t]hese are critical and sequential in nature, intended to guarantee all duly registered voters their right to vote in the general elections."[6] *Id.*

"Unsatisfied with the determination to reduce the registration term, a CEE Commissioner presented a filing for Reconsideration on May 11, 2023." (**ECF No. 47 at 12 ¶ 50**). The Reconsideration was denied by the CEE President on May 17, 2023. *Id.* Therefore, since May 17, 2023, the CEE announced that the closing date for voter registration for the 2024 general election was September 21, 2024.

In light of the above, on September 15, 2024, sixteen months after the Resolution was adopted, and six days prior to the registration deadline, three CEE Commissioners filed a Request for the Extension of Terms, seeking to revert the registration deadline to October 6, 2024. *Id.* ¶ 55. The CEE President denied the request, after which, an Appeal for Electoral Judicial Review and Declaratory Judgment was filed in the Court of First Instance of Puerto Rico, San Juan Superior Court ("Superior Court"). *Id.* at 13 ¶¶ 56-58. On September 20, 2024, the Superior Court denied the Commissioners' request, wherein it held that the Resolution complied with Article 2.3(19) of the Puerto Rico Electoral Code,[7] that the CEE was within its authority to issue the Resolution, and that the claim was time-barred regardless. (**ECF No. 33-1**).

---

[6]    These included: the recording of memory cards; creation of physical and electronic voting lists; preparation and notification of early voting and absentee voting lists; preparation and distribution of files to enable printing of the ballots; and preparation of briefcases to be distributed to the electoral colleges. (**ECF No. 33-1 at 3**).

[7]    Article 2.3(19) states:

For purposes of this subtitle, the following terms or phrases shall have the meaning indicated below:

Moving to the instant matter, Plaintiffs are registered voters who claim that deficiencies in Puerto Rico's voter registration system disenfranchised them from the upcoming election. (**ECF No. 47**). More broadly, they contend that the eRE that was to be implemented in July 2022, was implemented "with significant delay and lackluster implementation," as it was not fully operational until October 2023. *Id*. at 2 ¶ 3; (**Transcript 52:12-25; 53:1-6**). Moreover, Plaintiffs allege that the "platform has rejected applications and refused documents, leaving more than 81,000 applicants still waiting for confirmation" that they have successfully registered. (**ECF No. 47 at 2 ¶ 3**). They argue this situation is "worsened by electric power outbreaks at the Juntas de Inscripción Permanentes ("JIP's")—where voters may register in person—and delays that marred voter registrations at the University of Puerto Rico." *Id*. Plaintiffs also cite to the alleged reduction of JIP's by roughly 80% since the implementation of the 2020 Electoral Code, and the CEE's decision to withdraw from attending high schools to promote registration among young voters as other factors that have unduly burdened Puerto Rican citizens' right to vote. *Id*. at 3 ¶¶ 5-8. According to Plaintiffs, as of September 22, 2024, a total of 214,179 new registrations had either been approved and/or were pending approval. *Id*. at 9 ¶¶ 35-36; *Id*. at 12 at ¶ 54. Out of the 214,179 petitions, 133,179 had been approved, and as of that same date, roughly 80,000 were pending.[8] *Id*. However, neither

---

(19) Voter registration deadline. The due date prior to an election event, for a voter to be included, excluded, rendered active or inactive, or to update or change a voter's information, or carry out any transactions or request election-related registrations, transfers, or relocations in the General Voters Registry or through the Electronic Voters Registry System (eVR). This term shall not exceed fifty (50) days prior to any election event and the Commission shall make all efforts to reduce said term as much as possible, insofar as the technological systems provided in § 4523 of this title are established.

§ 4503 Definitions, 16 L.P.R.A. § 4503

[8]      The Court notes that at the hearing, the CEE Secretary testified that as of September 27, 2024, there were only 12,000 pending applications. (**Transcript at 17:19-25; 18:1**).

party provided the total number of voter registration applications received by the CEE for the 2024 electoral period.

With regards to Plaintiff Altieri, the record and evidence show that he is a first-time voter who attempted to register using the eRE system in mid-September 2024.[9] (**ECF No. 47 at 6 ¶ 20**). At the hearing, Altieri testified that he created an eRE account and submitted an application on September 9, 2024. (**Transcript 73:12-17**). He also testified that after attending an orientation at a JIP, he checked on his application and found that it had been rejected. (**Transcript 70:3-13**). On September 20, he received an email from the CEE stating the reasons for the rejection, to wit, failure to submit valid proof of address and identification. (**Transcript 70:12-16; 74:1-25**). He thereafter testified that the CEE instructed him to resubmit his application with an updated proof of address document and photo identification or to call "XXX-XXX-XXXX" to resolve the issue. (**Transcript 71:15-24; 76:9-23**). Altieri did not resubmit his application with the requested information. (**Transcript 76:9-22**). When pressed, he also admitted he did not attempt to visit an JIP because he had to work. (**Transcript 81:11-16**). In light of this, he maintains that the early closing date has jeopardized his right to vote. (**ECF No. 47 at 6 ¶ 20**).

### III.    Findings of Fact

The following findings of fact are drawn from the testimony adduced at the preliminary injunction hearing by CEE Secretary Cuevas, Plaintiff Altieri, as well as from the exhibits presented.

---

[9]    As will be further detailed below, Altieri is the only Plaintiff that testified at the hearing. Accordingly, for purposes of this section, citations to both the Amended Complaint and record are included. That said, the Court will only reference the allegations in the Amended Complaint for the remaining Plaintiffs, since no documentary or testimonial evidence was otherwise presented.

1.      Cuevas is employed as the CEE's General Secretary, a position he has held since 2021. (**Transcript 3:4-14**).

2.      Cuevas is the Custodian of Records and supervises the Quality Control Unit and the eRE system. (**Transcript 3:9-25; 14:14-25; 15:1-15**).

3.      In 2020, the Electoral Code of Puerto Rico was amended (the "Code"). "Puerto Rico Election Code of 2020" § 4501 Title, 16 L.P.R.A. § 4501.

4.      The 2020 Code adopted the electronic registration through the eRE system in addition to the in-person registration services provided at JIPs. (**Transcript 25:24-25; 31:1-9**).

5.      As per the Code, the eRE was to be implemented in July 2022. (**Transcript 52:12-21**).

6.      The eRE was not implemented until October 2023. (**Transcript 52:22-25; 53:1-6**).

7.      The Code also mandates for a reorganization of the JIPs, in which the number of JIPs were to be systematically reduced. (**Transcript 30:2-25; 26:1-5**).

8.      New voters and/or people seeking reactivation had four years to register for the 2024 election. (**Transcript at 61:4-9**).

9.      In 2021, and prior to the adoption of the eRE system, the CEE had 84 permanent JIPs. (**Transcript at 30:2-7**).

10.     In 2022, while implementing the eRE system, the CEE had 10 permanent JIPs and 24 temporary JIPs, for a total of 34 JIPs. (**Transcript at 29:13-16;2-4**).

11.     In 2023, the CEE had 13 permanent JIPs and 8 temporary JIPs, for a total of 21 JIPs. (**Transcript at 31:23-25; 32:1-2; 43:13-15**).

12.     In 2024, the CEE increased the number of JIPs to 12 permanent JIPs and 48 temporary JIPs, for a total of 60 JIPs. (**Transcript at 32:3-9; 44:4-11**).

13.     The CEE headquarters houses a permanent JIP. (**Transcript at 37:11-19**).

14.     Permanent and temporary JIPs provide the same services to those intending to register. (**Transcript 42:12-18**).

15.     In 2024, there was a period of several days where the CEE headquarters faced a power outage. (**Transcript at 37:5-10**).

16.     During that time, the CEE services were relocated to a functional location near the CEE headquarters so that there was no interruption of services for those seeking to register. (**Transcript at 38:14-25**).

17.     In the months leading up to the September 21, 2024 deadline, the JIPs extended their hours of operation. They were open six days a week until 8:00pm, including Saturdays. (**Transcript at 49:2-9; 60:12-20**).

18.     Voters were notified of these extensions via the CEE website, media, press releases, and various social media platforms such as Facebook and Instagram. (**Transcript at 49:10-22**).

19. There was a JIP at Plaza Las Américas Shopping Mall. This JIP operated within the extended hours the mall operated. (**Transcript at 46:13-20**).

20. On September 21, 2024, the final day of registration, the JIP's were open until 11:59pm. (**Transcript at 49:2-9**).

21. On September 16, 2024, the CEE granted a four-day grace period for applicants to remedy issues with their registration applications. (**Transcript at 72:10-22**).

22. As of September 21, 2024, 91,053 transactions had been submitted through the eRE system. (**Transcript 16:14-25; 17:1-6**).

23. As of September 27, 2024, there were 12,000 applications pending review in the eRE system. (**Transcript at 17:19-25; 18:1**).

24. Cuevas did not know the total number of new voter registrations for the 2024 electoral period. (**Transcript at 17:6-14**).

25. Cuevas did not receive any complaints regarding issues with the eRE system. (**Transcript 10:17-25; 11:1-25**).

26. Altieri is 27 years old, and works as a cook, salesman, and carpenter. (**Transcript at 65:14-18**).

27. Altieri is in school part-time and works every day. (**Transcript at 66:1-25**).

28. Altieri attended an orientation at a JIP pertaining to voter registration. (**Transcript at 75:5-10**).

29. On September 9, 2024, Altieri used the eRE system to register to vote. (**Transcript at 67:1-9**).

30. That same day, Altieri received an email notification that his petition was received. (**Transcript at 67:16-23; 68:1; 69:13-18**).

31. On September 20, 2024, Altieri received an email notification that his petition had been denied. (**Transcript at 70:7-14**).

32. Altieri's application was rejected for failing to submit an updated water bill and not providing valid identification. (**Transcript at 74:5-9**).

33. The email instructed Altieri to access his eRE account to remedy the issues in his application. (**Transcript at 74:15-25**).

34. In the email notifying Altieri his application had been denied, the number "XXX-XXX-XXXX" was given to call for more information. (**Transcript at 71:15-24**).

35. At no point did Altieri attempt to access his eRE account to submit an updated water bill or to re-upload his driver's license as requested by the eRE. (**Transcript at 75:18-25; 76:1-4**).

36. At no point did Altieri visit a JIP for assistance. (**Transcript at 76:14-23**).

37. Altieri made no communication efforts or inquires after his petition was rejected. (**Transcript at 74:15-25; 75:1-4**).

38. Despite receiving instructions on how to rectify his application, Altieri did not take any steps to address these issues. (**Transcript at 75:5-19**).

39.   Altieri did not visit a JIP before the deadline to register because he had to work. (**Transcript at 81:11-16**).

40.   Altieri was unaware of a Resolution issued by the CEE that granted a four-day grace period for applicants to remedy issues with their registration applications. (**Transcript at 72:10-22**).

## IV.    JURISDICTION

### A. Applicable Law

The right to vote "is of the most fundamental significance under our constitutional structure." *Burdick v. Takushi*, 504 U.S. 428, 433, 112 S. Ct. 2059, 2063, 119 L. Ed. 2d 245 (1992). Accordingly, "[t]t is certain that the right to vote—the wellspring of all rights in a democracy—is constitutionally protected. The Supreme Court long ago described the right as a fundamental political right." *Bonas v. Town of N. Smithfield*, 265 F.3d 69, 74 (1st Cir. 2001) (internal citations and quotations omitted).

That said, "the right to vote is not absolute." *Werme v. Merrill*, 84 F.3d 479, 483 (1st Cir. 1996) (citation omitted). "[A]s a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic process." *Id.* (internal citations and quotations omitted). "To that end, each state retains the authority to regulate state and local elections[.]" *Id.*; *see also Bonas*, 265 F.3d at 74 ("Election law, as it pertains to state and local elections, is for the most part a preserve that lies within the exclusive competence of the state courts."). However, a state's authority to regulate its own elections is not unfettered. *Werme*, 84 F.3d at 483. "At a minimum, states cannot wield their regulatory power in ways that contravene the First and Fourteenth Amendment rights of their citizens." *Id.*

It is well established that "[f]ederal courts are courts of limited jurisdiction, and therefore, must be certain that they have explicit authority to decide a case." *Bonas*, 265

F.3d at 73. In filing the instant claim, Plaintiffs invoke 42 U.S.C. § 1983, which establishes "a private right of action for violations of federally protected rights."[10] *Marrero-Gutiérrez v. Molina*, 491 F.3d 1, 5 (1st Cir. 2007). While "federal intervention is available under 42 U.S.C. § 1983 . . . such federal intervention into the state conduct of elections is considered an extraordinary measure . . . ." *Navedo v. Acevedo*, 752 F. Supp. 523, 528 (D.P.R. 1990), *aff'd sub nom. Granados-Navedo v. Acevedo*, 932 F.2d 94 (1st Cir. 1991).

Indeed, the First Circuit Court of Appeals has warned that "a federal court may not inject itself into the midst of every local electoral dispute." *Bonas*, 265 F.3d at 74. Instead, the First Circuit has "repeatedly held that federal courts must not intervene unless one of the few narrow and well-defined exceptions applies to justify intervention." *González-Cancel v. Partido Nuevo Progresista*, 696 F.3d 115, 119 (1st Cir. 2012) (collecting cases); *Valentín-Pérez v. New Progressive Party*, 857 F. Supp. 2d 214, 217 (D.P.R. 2012) ("Thus, in the context of an electoral dispute, a federal court may only intervene when the complaint presents a colorable claim under § 1983 *and* it falls within one of the exceptions to the general federal policy of non-intervention.") (emphasis in original).

"One exception allows federal intervention where a discrete group of voters are denied equal protection." *González-Cancel*, 696 F.3d at 119; *see also Rosselló-González v. Calderón-Serra*, 398 F.3d 1, 16 (1st Cir. 2004) (noting that while "each case must be evaluated on its own facts . . . there is a heavy presumption in favor of non-intervention if the party requesting intervention cannot show that a discrete group of voters has been disenfranchised by the challenged local action."). "Another exception applies where a

---

[10]         Puerto Rico is a state for purposes of Section 1983. *Elena v. Municipality of San Juan*, 677 F.3d 1, 6 n. 5 (1st Cir. 2012).

denial of substantive due process occurs; that is, where the election process reaches the point of patent and fundamental unfairness." *González-Cancel*, 696 F.3d at 119.

At one end of the spectrum, the First Circuit has held that state electoral processes that work "total and complete disenfranchisement of the electorate" are "patently and fundamentally unfair" and are thus "amenable to rectification in a federal court." *Bonas*, 265 F.3d at 75. There is no doubt that, where every resident of a political community is "deprived of his or her right to vote . . . such across-the-board disenfranchisement betokens an utter breakdown of the electoral process" and suffices "to support federal intervention." *Id.* In addition, it has long been settled that a federal court may intervene in cases involving "malapportioned voting districts or weighted voting systems[,]" "purposeful or systemic discrimination against voters of a certain class, geographic area, or political affiliation[,] and other willful conduct that undermines the organic processes by which candidates are elected[.]" *See Shannon v. Jacobowitz*, 394 F.3d 90, 96 (2d Cir. 2005) (internal citations omitted) (collecting cases).

At the other end of the spectrum, federal courts will decline to intervene in local elections to correct mere "garden variety election regularities." *Griffin v. Burns*, 570 F.2d 1065, 1076 (1st Cir. 1978). Cases that involve "tinkering with the state's election machinery, reviewing petitions, registration cards, vote tallies, and certificates of election for all manner of error and insufficiency," are within the exclusive cognizance of state courts. *Id.* at 1077. For instance, the First Circuit has previously held that federal courts may not intervene in local elections in cases involving a state court decision that enfranchised—rather than disenfranchised—local voters. *See Rosselló-González*, 398 F.3d at 1; *Partido Nuevo Progresista v. Barreto-Pérez*, 639 F.2d 825 (1st Cir. 1980).

Notably, the First Circuit has recognized that the distinction between "run-of-the-mill electoral disputes" and those that "can be characterized as harbingers of patent and fundamental unfairness" is not an easy one to draw. *Bonas*, 265 F.3d at 75. As a result, "each case must be evaluated on its own facts." *Id.*

When weighing the decision whether to intervene in a local electoral controversy, the First Circuit has inquired into three factors: (i) whether a discrete group of voters has been disenfranchised, (ii) whether there was a state process in place to handle the question posed by the plaintiffs, (iii) and whether the plaintiffs had availed themselves of that state process. *Rosselló-González*, 398 F.3d at 15–16 (citations omitted). When the party requesting federal intervention fails to show that a discrete group of voters has been disenfranchised by the challenged local action, "there is a heavy presumption in favor of non-intervention[.]" *Id.* (citations omitted).

### B. Analysis

In essence, Plaintiffs assert that, alongside other defects in the voter registration process, a registration deadline set 45 days in advance of the election is patently and fundamentally unfair. Specifically, Plaintiffs argue that the failure of local officials to provide for electronic voter registrations until October 2023, coupled with inadequate review mechanisms for rejected or pending applications, render the September 21, 2024 deadline unconstitutional.

Standing alone, the mere fact that the registration deadline is set 45 days in advance of the election is not in and of itself unconstitutional. *See Rosario v. Rockefeller, 410 U.S. 752* (1973) (upholding a voter registration deadline set eight months in advance of primary elections); *see also Marston v. Lewis*, 410 U.S. 679 (1973) (upholding voter registration deadline set fifty days in advance of state and local elections). As the Supreme

Court noted in *Buckley v. American Constitutional Law Foundation, Inc.*, voter registration requirements are "classic examples of permissible regulation."[11] 525 U.S. 182, 196 n. 17 (1999). The issue is thus whether the alleged additional defects in local voter registration processes render the deadline discriminatory to a discrete group of voters or "patently and fundamentally unfair." *Bonas*, 265 F.3d at 75.

### i.        Equal Protection

Beginning with the first exception outlined by the First Circuit, Plaintiffs argue that Defendants' "refusal to extend the voter registration deadline" violates the Equal Protection clause "because it irrationally and arbitrarily discriminates between Puerto Ricans based on the date within the lawful registration period on which they attempted to register to vote." (**ECF No. 10-1 at 23**). The Court presumes that Plaintiffs are attempting to demonstrate that a discrete class of voters, namely, those who registered close to the deadline, have been unfairly disenfranchised. However, the Court is unable to find, and Plaintiffs have not cited to, any authority suggesting that those who register close to voter registration deadlines constitute a discrete group of individuals for Equal Protection purposes. Rather, as Plaintiffs' counsel acknowledged at oral argument, Plaintiffs' claims are more broadly asserted on behalf of "the people of Puerto Rico" at large. (**Transcript 4: 18-19**).[12] Therefore, the Court cannot conclude that those who decided to register later in the process were a discrete class of individuals prejudiced by

---

[11]        Although Plaintiffs emphasize that Defendants' voter registration deadline is longer than any voter registration deadline for federal elections across the United States, that is because Congress requires the states to register voters "not later than the lesser of 30 days[.]" 52 U.S.C.S. § 20507.

[12]        *See also* Transcript 12:19-25 ("So we believe that we cannot simplify the reality that the limitation in the time frame, in order to register for the next elections, is affecting people around Puerto Rico, probably tens of thousands of people, according to the statistics that we have here, just because they decided to open before—or to close the registration process before the time frame established by the law in Puerto Rico.").

this choice such that the Equal Protection clause is implicated. Federal courts do not rewrite state election rules at the eleventh hour without clear constitutional violations.

### ii.        Due Process of Law

Moving to the next exception, Plaintiffs essentially argue that the implementation of the 2020 Electoral Code disenfranchised Puerto Rican voters such that the September 21, 2024, deadline is "patently and fundamentally unfair" and warrants federal intervention. In support, they cite to the reduction in the number of JIPs since 2020, a single power outage at the CEE headquarters—which houses a JIP, the late adoption of and alleged widespread issues with the eRE system, and the CEE's choice to advance the registration deadline by 15 days, to September 21, 2024. (**ECF No. 47**). However, Plaintiffs have not met their burden to establish that federal intervention is warranted.

As indicated above, the First Circuit has found that "total and complete disenfranchisement of the electorate" constitutes patent and fundamental unfairness. *Bonas*, 265 F.3d at 75.  In *Bonas*, the plaintiffs contested the Town of North Smithfield's decision to forgo an election entirely in violation of the town's charter. *Id.* There is no doubt that, where every resident of a political community is "deprived of his or her right to vote[,]" as in *Bonas*, "such across-the-board disenfranchisement betokens an utter breakdown of the electoral process" and suffices "to support federal intervention." *Id.* In addition, and as previously highlighted, it has long been settled that a federal court may intervene in cases involving "malapportioned voting districts or weighted voting systems[,]" "purposeful or systemic discrimination against voters of a certain class, geographic area, or political affiliation[,] and other willful conduct that undermines the organic processes by which candidates are elected[.]" *See Shannon v. Jacobowitz*, 394 F.3d 90, 96 (2d Cir. 2005) (internal citations omitted) (collecting cases).  As these cases

suggest, Plaintiffs must meet a high bar in order to demonstrate that federal intervention is warranted.

Under specific exigent circumstances, federal courts have previously entered preliminary injunctions to extend voter registration deadlines. In *Florida Democratic Party v. Scott*, the U.S. District Court for the Northern District of Florida entered a preliminary injunction ordering the state to extend the voter registration deadline after a hurricane hit the state. 215 F. Supp. 3d 1250 (N.D. Fla. 2016). In extending the deadline, the Court noted that "[l]ife-threatening winds and rain forced many Floridians to evacuate or, at a minimum, hunker down in shelters or their homes." *Id.* at 1254. Under similar circumstances, the U.S. District Court for the Southern District of Georgia ordered the state to extend the voter registration deadline after a hurricane had disrupted voter registrations. *See Georgia Coalition for the People's Agenda, Inc. v. Deal*, 214 F. Supp. 3d 1344 (S.D. Ga. 2016). In 2020, as a result of disruptions caused by the COVID-19 pandemic, the Western District of Wisconsin ordered state officials to extend the voter registration deadline. *Democratic Nat'l Comm. v. Bostelmann*, 447 F. Supp. 3d 757 (W.D. Wis. 2020). Similarly, this Court previously entered an order to extend the voter registration deadline for senior citizens applying for early voting or absentee ballots in the November 2020 elections, reasoning that the COVID-19 pandemic's effects on senior citizens and their right to vote justified federal intervention. *Ocasio v. Comisión Estatal de Elecciones*, 486 F. Supp. 3d 478, 481 (D.P.R. 2020). In each of these cases, *force majeure*[13] level events disrupted local voter registration processes, rendering voter

---

[13]        "Force majeure incidents typically include wars, natural disasters (e.g., earthquakes), terrorist attacks, epidemics, and civil unrest, such as riots." Baugh, L. Sue. "force majeure." Encyclopedia Britannica, September 18, 2024. https://www.britannica.com/topic/force-majeure.

registration deadlines fundamentally unfair and unworkable.

These situations are notably different than the circumstances before the Court. Here, there was no intervening event that effectively shut down the voter registration process in the months or days leading up to the September 21, 2024 deadline. There is no evidence on record to suggest as much either. Instead, testimony from Cuevas establishes, since October of 2023, that is 11 months before the September 21, 2024 deadline, the eRE system was up and running, providing citizens with the alternative of registering online, in addition to the in-person registration available through 60 JIPs across the island. Cuevas also testified that in the weeks leading up to the deadline, the 60 JIPs were open for extended hours, including on Saturdays. Moreover, Plaintiffs failed to present any evidence, nor did Altieri testify, that the eRE system malfunctioned, crashed, shut down, or was ineffective in the weeks leading up to the deadline, which corroborates Cuevas's testimony that he did not receive any complaints regarding the eRE system.

Moreover, the Court notes that Plaintiffs, along with Puerto Rican citizens generally, have had four years to register to vote. That would be immaterial if the registration system was so ineffective that it disenfranchised voters completely, but the record is devoid of any evidence to that effect. While it is indeed undisputed that the number of JIPs was reduced in the four years since the Code's amendment, there were still numerous operational JIPs throughout the preceding four years. In 2024 alone there were 60 operational JIPs, along with the eRE system. Put in a different way, since October of 2023, voters across the island had not one, but two mechanisms to register: by electronic means and in-person registration.

Plaintiffs' citation to a power outage at the CEE headquarters also does not move the needle in their favor. First, Plaintiffs only made reference to a single power outage.

However, Cuevas testified that during the mentioned power outage, the JIP services were promptly relocated to an operational facility nearby the CEE Headquarters in Hato Rey. Therefore, prospective voters were not materially impacted. Second, there were numerous other JIPs (59) at any given time that prospective voters, Plaintiffs included, could have visited for in-person registration. Finally, prospective voters that did not want to visit a JIP could register through the eRE system.

Plaintiffs also make much of the delayed implementation of the eRE system, but the Court does not see how this event caused widespread disenfranchisement.[14] From 2021 to 2023, there were at minimum 34 JIPs operational. And while Plaintiffs allege "multiple glitches of the eRE platform" made registration through the system "virtually impossible for most users," the record is devoid of evidence demonstrating as much. (**ECF No. 47 at 12 ¶ 52**).

Finally, the evidence proffered by Altieri further supports that federal intervention is not warranted. As per his testimony, Altieri was able to visit a JIP, where he received orientation. He further testified that he was able to submit an application using the eRE system, but that his application was denied. He admits that the reason his application was denied was because he failed to submit a sufficiently recent utility bill demonstrating proof of address and a proper photo identification card. This is a proper and successful use of the eRE system. Although he was not provided with a phone number to contact the CEE, the notification received through the eRE instructed him to re-submit the proper

---

[14]    At oral argument, Plaintiffs characterized the delayed implementation of eRE as a significant source of voter disenfranchisement. Specifically, Plaintiffs argued that Defendants failure to implement the system in July 2022, as required by local law, disenfranchised voters. Whether a federal court would have had jurisdiction in July 2022 to review the delayed implementation of the eRE system, though questionable, is not now before the Court. Instead, Plaintiffs have brought this claim over two years later and after the voter registration deadline has already elapsed.

documentation, which he failed to do before the registration deadline.

Plaintiff Marina Espíritu fares similarly. She alleges that she filed a petition for reactivation through the eRE system. The petition was denied, and she was instructed to visit a JIP to complete the process. *Id*. at 5 ¶ 19. However, she failed to do so because "she does not have a car and has mobility issues."[15] *Id*. As the First Circuit opined in *Rosselló-González v. Calderón-Serra*, factors to consider when deciding to intervene in state electoral affairs are "whether there was a state process in place to handle the question posed by the plaintiffs, [] and whether the plaintiffs had availed themselves of that state process." 398 F.3d at 15–16.

Plaintiff Altieri and Espíritu did not avail themselves of the state processes available to them even after being instructed to do so. The Court finds no evidence of widespread disenfranchisement; instead, Plaintiffs' failure to register stemmed from correctable individual issues.

Plaintiffs Alicia Vázquez-Figueroa and Iris Delia Torres-López have also successfully navigated the eRE system and are simply awaiting resolution of their pending applications. (**ECF No. 47 at 6 ¶¶ 21-22**). Accordingly, any alleged prejudice, at this juncture, is speculative.

In sum, the Court "is unconvinced that these alleged violations rise to the level of severity required by *Bonas* and *Griffin*." *González-Cancel v. Partido Nuevo Progresista*, 11-cv-2149, 2012 WL 12949357, at *5 (D.P.R. Feb. 10, 2012), *aff'd,* 696 F.3d 115 (1st Cir. 2012). The alleged obstacles of the registration process do not amount to disenfranchisement, particularly against the backdrop of the four specific Plaintiffs'

---

[15]    Ms. Espíritu did not provide the dates in which she filed for reactivation, nor when she received notice from the CEE.

circumstances in this case. As mentioned, two are awaiting resolution of their pending applications, and the other two did not avail themselves of available state processes when instructed to do so.

Moreover, even when given the opportunity to present evidence of the alleged obstacles, Plaintiffs failed to do so. At the hearing, the testimony of Altieri, the sole Plaintiff testifying, did not suggest a widespread failure and ineffectiveness of the eRE system or that the reductions in JIPs played a role in his failure to register. To the contrary, Altieri received orientation at a JIP and filed his application, without any issues using the eRE system. Moreover, per the testimony of Cuevas, 91,053 applications had been submitted through the eRE system, in addition to the ones that have been processed at the JIPs.  Accordingly, bearing in mind that "federal intervention into the state conduct of elections is considered an extraordinary measure[,]" the Court does not find that Plaintiffs have been disenfranchised such that federal intervention is warranted.[16] *Navedo v. Acevedo*, 752 F. Supp. 523, 528 (D.P.R. 1990), *aff'd sub nom. Granados-Navedo v. Acevedo*, 932 F.2d 94 (1st Cir. 1991).

## V.    MOTION FOR PRELIMINARY INJUNCTION

Even if the Court were to find it had jurisdiction to intervene, a preliminary injunction is not warranted. To be clear, the Court has only one Plaintiff before it

---

[16]    Plaintiffs also raise a brief argument that Defendants "refusal to extend the voter registration deadline" violates the Due Process Clause "because it is fundamentally unfair to announce that prospective Puerto Rico voters could register to vote online through October 6, and then deny those same prospective Puerto Rico voters the ability to register to vote through October 6." (**ECF No. 10-1 at 23**). However, as established by the evidence on the record, the registration was advanced by only 15 days, the term remained within statutory boundaries and the new date was set 16 months prior to the deadline. Plaintiffs do not allege any facts supporting the notion they were uninformed and relied on previous representations as to the deadline to their detriment. Accordingly, this argument is unavailing.

requesting injunctive relief.[17] The Court therefore only addresses the request for a preliminary injunction with respect to that plaintiff, Alteri, based on the evidence he presented to support injunctive relief.[18]

When a party seeks a preliminary injunction, a district court must consider four well-established elements: "(1) the probability of the movant's success on the merits of [his/her] claims; (2) the prospect of irreparable harm absent the injunction; (3) the balance of the relevant equities []; and (4) the effect of the court's action on the public interest." *Santiago v. Municipality of Utuado*, 114 F.4th 25, 35 (1st Cir. 2024) (cleaned up). The Court will address each in turn.

### i.    Likelihood of Success

Though each factor in the preliminary injunction analysis is important, "[t]he sine qua non of this four-part inquiry is likelihood of success on the merits." *Arlene Ocasio v. Comisión Estatal de Eleccione*s, 486 F. Supp. 3d 478, 484 (D.P.R. 2020); *Mass. Coalition of Citizens with Disabilities v. Civil Def. Agency & Office of Emergency Preparedness of Commonwealth of Mass.,* 649 F.2d 71, 76 n. 7 (1st Cir.1981) (stating that a preliminary injunction should be used sparingly). "[I]f the moving party cannot demonstrate that he

---

[17]    First, Plaintiffs Altieri and Figueroa have not formally moved for a preliminary injunction; they were merely substituted as plaintiffs in the Amended Complaint. (**ECF Nos. 10-1, 47**). Second, Plaintiffs Espíritu and Torres-López—the only two remaining plaintiffs that were included in the pending motion— did not testify at the hearing. Given "[t]he party seeking the preliminary injunction bears the burden of establishing" their right to the requested relief, the Court granted Defendants' motion made on the record to deny their request for a preliminary injunction. *Esso Standard Oil Co. (Puerto Rico) v. Monroig-Zayas*, 445 F.3d 13, 18 (1st Cir. 2006). However, out of an abundance of caution, and in the interest of being thorough, the Court will address Altieri's implicit request for a preliminary injunction, given he did appear and testify at the hearing.

[18]    The Court notes that there are three key procedural defects in the request for a preliminary injunction: first, Altieri, the sole Plaintiff, failed to formally join the original motion for the injunction; second, the last-minute notice to the opposing party regarding his specific involvement; and third, the untimely nature of his request, which effectively seeks retroactive relief. Despite these deficiencies and pursuant to Federal Rule of Civil Procedure 65, the First Circuit's preference to resolve matters on their merits rather than on procedural technicalities guides this Court's discretion. Accordingly, the Court will proceed to evaluate the motion on its merits, as the interests at stake involve core constitutional rights; therefore, the spirit of the law rather than the letter of the law compels a thorough consideration.

is likely to succeed in his quest, the remaining factors become matters of idle curiosity."

*New Comm Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002).

The First Circuit reviews "all of the First and Fourteenth Amendment claims under the sliding scale approach announced by the Supreme Court in *Anderson v. Celebrezze*, 460 U.S. 780, 789-90 (1983), and *Burdick v. Takushi*, 504 U.S. 428, 434 (1992). This method of analysis for election regulations requires an assessment of the burdens, if any, placed on plaintiff's constitutionally protected rights, followed by an evaluation of the precise interests put forward by the state as justifications for the burdens." *Libertarian Party of New Hampshire v. Gardner*, 638 F.3d 6, 14 (1st Cir. 2011) (internal citations omitted). "[W]hen a state election law provision imposes only reasonable, nondiscriminatory restrictions upon the First and Fourteenth Amendment rights of voters, the State's important regulatory interests are generally sufficient to justify the restrictions." *Id.*

Here, Plaintiffs argue in their Motion that the CEE's failure to properly implement the 2020 Election Code's voter registration measures imposes a severe burden on their right to vote, thus triggering strict scrutiny. (**ECF No. 10 at 18**). Plaintiffs propose that extending the registration deadline to October 6, 2024, represents a less restrictive alternative for achieving the State's objectives. *Id.* at 17-19.

However, the record does not substantiate that the challenged measures amount to a severe restriction. For example, Altieri attended a JIP orientation and timely registered through the eRE system without any procedural or technical issues. The CEE reviewed his application, which was denied on September 20, 2024, due to missing documents, namely a recent water bill to verify his address and valid photo identification. Despite receiving clear instructions for rectifying the deficiencies, Altieri failed to take

corrective action by re-uploading the necessary documents or visiting a JIP in person. (**Transcript 67 ¶¶ 1-9; 75 ¶¶ 5-19**). This failure to act, rather than any insurmountable obstacle within the registration process, led to his inability to register.

Similarly, Altieri's Fourteenth Amendment equal protection claim does not establish that the eRE system disproportionately affects any specific voter class. Altieri's situation arose from a correctable procedural issue rather than systemic exclusion. Additionally, Altieri failed to provide evidence of discriminatory intent or disparate impact on a protected class.

In *Dobson v. Dunlap*, the District of Maine emphasized that "substantial state regulation is a prophylactic that keeps the democratic process from disintegrating into chaos." 576 F. Supp. 2d 189 (D. Me. 2008). It held that a "reasonably diligent independent candidate, not a last-minute procrastinator," is the constitutional standard contemplated. *Id.* at 190–91. This principle underscores the expectation that voters and candidates should act with reasonable diligence in complying with electoral procedures.

Extending the rationale of *Dunlap*, the Court finds that Altieri's lack of action demonstrates a failure to exercise the reasonable diligence expected of voters. Just as the *Dunlap* court held that candidates bear the responsibility of complying with election procedures in a timely manner, Altieri's delay in addressing the deficiencies in his application reflects a similar lack of urgency. The Court concludes, therefore, that the alleged burdens associated with the eRE system and earlier registration deadline fall within the scope of "reasonable, nondiscriminatory restrictions" consistent with *McClure v. Galvin*. 386 F.3d 36, 41 (1st Cir. 2004).

As in *Dunlap*, where the constitutional standard required reasonable diligence and the responsibility to avoid procrastination, Altieri has not shown that the alleged burdens

on the right to vote meet the threshold of severity needed to establish a likelihood of success on the merits. *See Dunlap*, 576 F. Supp. 2d at 189.

### ii.    Irreparable Harm

Moving to the next factor, "the burden of demonstrating that a denial of interim relief is likely to cause irreparable harm rests squarely upon the movant." *Charlesbank Equity Fund II v. Blinds to Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004). "In most cases—and this case is no exception—irreparable harm is a necessary threshold showing for awarding preliminary injunctive relief." *Matos ex rel. Matos v. Clinton Sch. Dist.*, 367 F.3d 68, 73 (1st Cir. 2004) (citation omitted).

In the instant matter, Altieri alleges in the Amended Complaint that "his right to vote has been jeopardized" due to the September 21, 2024, registration deadline. (**ECF No. 47 at 6 ¶ 20**). While the Court recognizes that the inability to vote in an upcoming election may constitute irreparable harm, Altieri's testimony did not support this contention. At the hearing, it became clear that Altieri had the opportunity to correct the deficiencies in his application and did not. While the Court acknowledges that he was not provided with the CEE's phone number, he proffered no justification for why he could not use the eRE system to update his application materials in time before the registration deadline, which is what he was instructed to do. "A preliminary injunction movant does not satisfy the irreparable harm criterion when the alleged harm is self-inflicted." *Fiba Leasing Co. v. Airdyne Indus., Inc.*, 826 F. Supp. 38, 39 (D. Mass. 1993) (citing *San Francisco Real Estate v. Real Estate Invest. Trust of America*, 692 F.2d 814, 818 (1st Cir. 1982)). Accordingly, this factor tips in favor of Defendants.

### iii.    Balance of Hardships and the Public Interest

The Supreme Court has noted that "[t]he third and fourth factors, harm to the opposing party and the public interest, merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418 (2009). Accordingly, the Court will analyze these factors together.

In the instant case, the public interest weighs in favor of the Government. Under *Purcell*, courts are disfavored from ordering changes in election law when an election is imminent. *See Purcell v. González*, 549 U.S. 1, 5–6 (2006) ("Given the imminence of the election and the inadequate time to resolve the factual disputes, our action today shall of necessity allow the election to proceed without an injunction suspending the voter identification rules."). Here, Plaintiffs claims were brought only after the challenged registration deadline had already elapsed. Yet the Supreme Court has "repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election." *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207 (2020) (per curiam).[19]

Under these circumstances, the Government's interest in maintaining the *status quo* is strong. For their part, Plaintiffs assert that the balance of hardships tips in their favor, as the harm to them and other voters is significant and irreparable, while the administrative burden on the Commission to extend the registration deadline is minimal. (**ECF No. 10 at 26-27**). Plaintiffs also argue that the public interest strongly favors enabling all eligible voters to register and participate in the election. They contend that

---

[19]     In *South Carolina Progressive Network Education Fund v. Andino*, for instance, the plaintiffs challenged a state requirement that voters register to vote no later than 30 days before election, arguing that it presented a severe undue burden in light of the COVID-19 pandemic. 493 F.Supp.3d 460 (D.S.C. 2020). In part because the lawsuit was filed only 3 days before the registration deadline, the District Court denied plaintiff's request for a preliminary injunction extending the voter registration deadline.

the premature closing of registration and eRE's failures "severely impact voter registration and participation," creating a public interest imperative to grant relief. (**ECF No. 47 at 3**).

Yet the evidence presented by Plaintiffs at the preliminary injunction hearing did not lend substantial evidentiary support to these overbroad claims of voter disenfranchisement. As noted above, only one Plaintiff, Altieri, testified at the evidentiary hearing. His testimony established not that he had been disenfranchised by state policy, but instead that he had failed to properly amend his defective voter registration application when afforded an opportunity to do so. In light of these facts, federal intervention at the eleventh hour in local electoral proceedings is not warranted.

In sum, the administrative challenges to be faced by the CEE by such an extension, and the ample opportunities for voters to correct registration errors, indicate that the interests weigh in favor of the Government.

Extending deadlines may seem simple, but it risks undermining the structure of a fair election. While there is certainly a strong public interest supporting broad voter participation, it also encompasses the orderly administration of elections. *See Veasey v. Abbott*, 830 F.3d 216, 328 (5th Cir. 2016) (citing *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 196 (2008) ("the interest in orderly administration and accurate recordkeeping provides a sufficient justification for carefully identifying all voters participating in the election process."). The evidence adduced at the hearing does not demonstrate that any alleged burdens on voter registration directly undermined the public interest. The failure of Altieri and others to complete the registration process after receiving clear instructions does not substantiate a need for preliminary injunctive relief. The administrative need for adherence to set deadlines, as argued by Defendants,

supports the view that maintaining the current registration timeline serves the public interest. (**ECF No. 48 at 7**).

### VI.    Conclusion

In sum, this Court declines to intervene in Puerto Rico's electoral processes or grant the extraordinary remedy of a preliminary injunction. Plaintiffs have failed to demonstrate that the September 21, 2024, voter registration deadline amounts to unconstitutional disenfranchisement or patent unfairness warranting federal intrusion into state election administration. While the implementation of new registration systems *may* not have been without flaws, the evidence before this Court does not rise to the level of systemic failure or widespread voter suppression. Plaintiffs have clearly failed to substantiate their allegations with competent evidence. *See ST Eng'g Marine, Ltd. v. Thompson, Maccoll & Bass, LLC, P.A.*, 88 F.4th 27, 39 (1st Cir. 2023) ("Allegations are not evidence[.]"); *see also Rodríguez-Severino v. UTC Aerospace Sys.*, 17-cv-2227, 2020 WL 5887545, at *3 n. 3 (D.P.R. July 31, 2020), *aff'd,* 52 F.4th 448 (1st Cir. 2022) ("Mere allegations are not evidence.") (citation omitted).

The testimony of Altieri is particularly telling—he was able to submit an application through the eRE system and received clear instructions on remedying deficiencies yet failed to take advantage of multiple avenues to complete his registration. Such individual lapses in diligence do not justify upending established deadlines on the eve of an election. The public interest is best served by maintaining the status quo of orderly electoral processes, absent a showing of severe, discriminatory burdens on voting rights.

While expanding voter access is an undeniably laudable goal, it must be balanced against the Government's substantial interest in ensuring fair, efficient elections. Plaintiffs' requests, even if well-intentioned, lack factual and legal support and threaten

to inject chaos into the administration of Puerto Rico's election machinery at this late hour without any evidentiary justification for doing so.

This Court will not risk disenfranchising the hundreds of thousands of Puerto Rico's electorate who successfully navigated the registration process in order to accommodate those who, through no fault but their own, failed to complete timely registration. This case is thus **DISMISSED** for lack of jurisdiction.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 1st day of October, 2024.

**<u>s/ María Antongiorgi-Jordán</u>**
**MARIA ANTONGIORGI-JORDAN**
**UNITED STATES DISTRICT JUDGE**